IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IVORY C. WEATHERSBEE,

    *Plaintiff*,

v.

    Civil Action No. ELH-12-633

BALTIMORE CITY FIRE
DEPARTMENT, *et al.*,

    *Defendants*.

## MEMORANDUM OPINION

Ivory C. Weathersbee, plaintiff,[1] a firefighter in Baltimore City, has sued the Baltimore

City Fire Department ("BCFD"); its Chief, James S. Clack; and the Mayor & City Council of

Baltimore ("City"), defendants, asserting four claims: employment discrimination on the basis of

race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (Count

One); retaliation, also in violation of Title VII (Count Two); violation of his rights to due process

and equal protection of the law under the Fourteenth Amendment to the Constitution of the

United States, by way of a claim under 42 U.S.C. § 1983 (Count Three); and a claim of

employment discrimination on the basis of race under 42 U.S.C. § 1981 (Count Four).

Following discovery, defendants filed a Motion for Summary Judgment (ECF 20), which

has been fully briefed.[2]  No hearing is necessary to resolve it.  *See* Local Rule 105.6.  For the

---

[1]  Although plaintiff's counsel filed plaintiff's complaint with the style *Ivory C. Weathersby v. Baltimore City Fire Department, et al.*, it is apparent from the record (including plaintiff's deposition and several documents authored by plaintiff) that the correct spelling of plaintiff's last name is "Weathersbee."  The Clerk will be directed to correct the spelling of plaintiff's name in the caption and on the docket.

[2]  I have considered the Motion for Summary Judgment (ECF 20) and its supporting memorandum (ECF 20-1) (collectively, "Motion"), plaintiff's Opposition (ECF 26), and

reasons that follow, the Motion will be granted.

## Factual Background

Mr. Weathersbee, who is African American, is employed by the BCFD. He joined the department as a firefighter in 1991. *See* EEOC Charge of Discrimination at 1 ("EEOC Charge"), Ex.E to Motion (ECF 20-7). He was promoted to the rank of lieutenant in or around 2000. *See* Deposition of Ivory Weathersbee at 8 ("Weathersbee Dep."), Ex.J to Motion (ECF 20-12). As of March 2009, he held the rank of lieutenant and was assigned to Engine Company No. 31 ("Engine 31"). A "company" in the BCFD is a four-person crew of firefighters assigned to an engine or truck. *See* Declaration of James S. Clack ¶ 16 ("Clack Decl."), Ex.I to Motion (ECF 20-11). A lieutenant is the first-line supervisor in charge of a company and is the lowest rank in the BCFD officer corps. *Id.* ¶¶ 9, 15.

On March 17, 2009, at approximately 9:14 a.m., a radio call was transmitted by BCFD dispatch, directing Engine 31 and an ambulance unit to respond to a report of a patient who was hemorrhaging at 2700 North Charles Street, in Baltimore. Mr. Weathersbee failed to acknowledge the call, and Engine 31 did not respond to the scene. The ambulance unit arrived on the scene at 9:28, and exited the building with the patient at approximately 9:30. Because Engine 31 had not arrived, the ambulance crew notified dispatch to cancel the call for Engine 31. *See generally* Ex.A to Motion (ECF 20-2) (incident reports). Mr. Weathersbee was subsequently charged by his Captain in an internal disciplinary proceeding with failure to give undivided attention to his duties and failure to respond to an alarm, both violations of BCFD regulations.

defendants' Reply (ECF 28), as well as exhibits submitted with the briefing.

The charges were sustained and, after a number of hearings, *see* Dec. 14, 2012, Deposition of Ivory C. Weathersbee at 25 ("Weathersbee Dep."), Ex.J to Motion (ECF 20-12), Chief Clack determined, with the concurrence of other ranking officers, to demote Mr. Weathersbee from lieutenant to firefighter.

The incident on March 17, 2009, had been the most recent of three occasions on which Engine 31, under Mr. Weathersbee's command, had failed to respond to the scene of an emergency call. Mr. Weathersbee had received disciplinary sanctions of increasing severity for the earlier incidents. *See generally* Ex.A to Motion (incident reports and disciplinary records). He had also been disciplined on fifteen other occasions for other infractions, including missing a shift, being late to shifts, or failing to complete administrative duties, such as payroll and scheduling for his company. *See generally* Ex.B & C to Motion (ECF 20-4 & 20-5) (incident reports and disciplinary records).

Accordingly, on July 22, 2009, Chief Clack issued General Order 48-09, formally demoting Mr. Weathersbee to firefighter and reassigning him to another fire company. *See* Gen'l Order 48-09, Ex.D to Motion (ECF 20-6). The demotion entailed a decrease in salary from approximately $70,000 to $50,000 per year. *See* EEOC Charge at 1. Mr. Weathersbee appealed the demotion to the Baltimore City Civil Service Commission and also filed a grievance through his union, Fire Local 964. *See* EEOC Charge at 2. No records from the appeal or the grievance, as such, are contained in the record. However, Mr. Weathersbee has submitted copies of two emails sent to him on October 22, 2009, by Stephen Fugate, the president of the union and a captain in the BCFD, which were sent within an hour of each other. *See* Fugate Emails, Ex.A-5 to Opposition (ECF 28-1 at 12). Collectively, the emails advised

Weathersbee that the Department and the Union "are in agreement that [Weathersbee's] demotion from July will be a temporary demotion and that [Weathersbee would] be re-promoted in January of '10 as a position becomes available," provided that Weathersbee agreed to waive any "claim for 'back-pay' to recoup the difference in salary from July through January." *Id.* *See also* Affidavit of Ivory C. Weathersbee ¶ 10 ("Weathersbee Aff."), Ex.A-1 to Opposition (ECF 28-1 at 1) (stating that Fugate is the union president and a captain in the BCFD).[3] "In other words," according to Fugate, Weathersbee's "penalty would be limited to the temporary reduction in rank from July to January inclusive of the salary difference and that's the end of that." Fugate Emails. Mr. Fugate advised Weathersbee that it was important that Weathersbee decide whether to accept this resolution "ASAP so this information can be passed along to the Hearing Officer scheduled to hear [Weathersbee's] case next Friday." *Id.* However, he stated: "If you would prefer to roll-the-dice with a hearing, . . . that's up to you." *Id.*

In his affidavit, Weathersbee recounts that the BCFD "wanted [him] to give up a claim to back pay which at the time would have been for more than $10,000." Weathersbee Aff. ¶ 11. He avers that he rejected the proposal outlined by Mr. Fugate, explaining: "I was willing to be reinstated as a Lieutenant. That is what I have been fighting for. I was not willing to give up my claim to back pay." *Id.* No other information concerning plaintiff's Civil Service Commission appeal or his union grievance is contained in the record. However, neither route was apparently successful for plaintiff, because he remains a firefighter. In his affidavit, he states: "Financially,

---

[3] Although the exhibits to plaintiff's Opposition totaled only twelve pages, plaintiff did not submit them electronically, instead filing them in paper format along with a notice of lengthy exhibit. *See* ECF 26-1. Defendants submitted a copy of plaintiffs' exhibits as an exhibit to their reply so that a copy of the exhibits would be available in the court's electronic filing system.

for nearly the last three years, I have lost at least 15% of what my compensation would have been as a Lieutenant."  *Id.* ¶ 12.

On January 27, 2010, Weathersbee filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  *See* EEOC Charge.  The EEOC issued a "right-to-sue letter" to Weathersbee on October 18, 2011.  *See* Right-to-Sue Letter, Ex.F to Motion (ECF 20-8).  He filed suit in this Court on February 27, 2012.

Additional facts will be included in the Discussion.

## Discussion

### A.  Standard of Review

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In resolving a motion for summary judgment, a district court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013); *News and Observer Publishing Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue.  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir.2003) (quoting

former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The district court's "function" in resolving a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248.

### B. Proper Parties

At the outset, defendants argue that only the City is a proper party to this suit. Plaintiff does not contest this argument.

Defendants are correct that no claims are viable against the BCFD. The Baltimore City Fire Department is an executive department of the City government that does not have an independent legal identity or the capacity to sue or be sued. *See Jenkins v. Balt. City Fire Dept.*, 862 F. Supp. 2d 427, 441-42 (D. Md. 2012) (holding that "BCFD (unlike the City itself) is not an entity that can be sued"), *aff'd on other grounds*, ___ F. App'x ___, 2013 WL 1767630 (4th Cir. Apr. 25, 2013); *see id.* at *1 n.* ("Plaintiffs do not appeal the district court's entry of summary judgment in favor of Defendant BCFD on the ground that it is not an entity that may be sued."); *see also* BALT. CITY CHARTER, Art. I, § 1 (establishing City as "[c]orporate entity" with power to "sue and be sued"); Art. VII, § 47 (establishing BCFD, without grant of capacity to sue and be sued). Therefore, all claims against BCFD will be dismissed, with prejudice.

Defendants are only partly correct with respect to Chief Clack. Defendants correctly note that individual supervisors are not liable under Title VII. An individual person can only be liable under Title VII if that person qualifies as an "employer" within the meaning of the statute. *See*

*Lissau v. Southern Food Servs., Inc.*, 159 F.3d 177, 181 (4th Cir. 1998) (holding that

"supervisors are not liable in their individual capacities for Title VII violations"); *cf. Luy v. Balt.*

*Police Dept.*, 326 F. Supp. 2d 682, 688 (D. Md. 2004) (dismissing Title VII claim against police

commissioner), *aff'd*, 120 F. App'x 465 (4th Cir. 2005); *Erskine v. Bd. of Educ.*, 197 F. Supp. 2d

399, 405 (D. Md. 2002) (dismissing Title VII claims against public school administrators).

Accordingly, plaintiff's Title VII claims cannot proceed against Chief Clack.[4]

However, Chief Clack is a proper defendant with respect to plaintiff's claims under 42

U.S.C. §§ 1983 and 1981. "[L]ocal government officials sued in their official capacities are

'persons' under § 1983 in those cases in which . . . a local government would be suable in its

own name," and are subject to suit in both their official and individual capacities. *Monell v.*

*Dept. of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 n.55 (1978). Moreover, individual

supervisors may be liable under § 1981 if "they 'intentionally cause [an employer] to infringe the

rights secured by" section 1981." *Carson v. Giant Food, Inc.*, 187 F. Supp. 2d 462, 483 (D. Md.

2002) (quoting *Tillman v. Wheaton-Haven Recreation Ass'n*, 517 F.2d 1141, 1145 (4th Cir.

---

[4] Although Chief Clack cannot be individually liable under Title VII, his actions and motivations, as well as those of other "supervisors" of plaintiff, are relevant to the analysis of employer liability. *See, e.g.*, *Staub v. Proctor Hosp.*, ___ U.S. ___, 131 S. Ct. 1186, 1194 (2011) (adopting, in the context of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), a statute that the Court remarked was "very similar to Title VII," *id.* at 1191, the so-called "cat's paw" theory of liability, *i.e.*, that, "if a supervisor performs an act motivated by . . . animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable," even if the ultimate decision maker as to the adverse action did not have a discriminatory animus) (emphasis in original); *see also Vance v. Ball State Univ.*, ___ U.S. ___, 133 S. Ct. 2434, 2439, 2443 (2013) (holding that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim," *i.e.*, "to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits'") (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

1975)), *aff'd sub nom. Skipper v. Giant Food, Inc.*, 68 F. App'x 393 (4th Cir.), *cert. denied*, 540 U.S. 1074 (2003); *accord Tibbs v. Balt. Police Dept.*, Civ. No. RDB-11-1335, 2012 WL 3655564, at *6 (D. Md. Aug. 23, 2012) ("[W]hile individual liability for supervisors may arise under 42 U.S.C. § 1981, it only applies where the act or omission resulting in the infringement of rights was intentionally caused by the supervisor . . . ."); *Luy*, *supra*, 326 F. Supp. at 688; *see also Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012) ("One key difference between § 1981 and Title VII is that the latter authorizes suit only against the employer as an entity rather than against individual people who are agents of the employer. Under § 1981, individuals may be liable."). Accordingly, plaintiff's § 1981 and § 1983 claims against Chief Clack could be viable if plaintiff sufficiently alleged grounds for his individual liability.

## C. Title VII: Timeliness

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of race and other considerations. Under Title VII, a "person aggrieved" by an alleged unlawful discriminatory employment practice must file a "charge" of discrimination with the EEOC or an appropriate state or local agency within a specified time "after the alleged unlawful employment practice occurred," 42 U.S.C. § 2000e-5(e)(1), and "cannot bring suit until he has exhausted the administrative process." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509. (4th Cir. 2005). Upon completion of the administrative process, the EEOC must give notice to the complainant of the complainant's right to file suit. *See* 42 U.S.C. § 2000e-5(f)(1). This notice is commonly called a "right-to-sue letter." *See, e.g.*, *Laber v. Harvey*, 438 F.3d 404, 416 (4th Cir. 2006). A complainant has ninety days to file suit in federal or state court after being notified of the right to sue. *See* 42 U.S.C. § 2000e-5(f)(1); *see also Yellow Freight Sys., Inc. v. Donnelly*,

494 U.S. 820 (1990) (holding that state courts have concurrent jurisdiction with federal courts to adjudicate Title VII claims).[5]

The ninety-day time limit after notification of the right to sue for initiating litigation under Title VII is not a jurisdictional requirement. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 398 (1982); *Jones*, *supra*, 551 F.3d at 300 & n.2; *Prelich v. Med. Resources, Inc.*, 813 F. Supp. 2d 654, 662-63 (D. Md. 2011). Instead, the time limit is treated "'like a statute of limitations.'" *Chacko*, 429 F.3d at 513 n.5 (4th Cir. 2005) (quoting *Zipes*, 455 U.S. at 393). Nevertheless, the ninety-day limit is strictly enforced. In the absence of evidence of the date of receipt, a right-to-sue letter is presumed to have been received by the plaintiff three days after it was issued and mailed, pursuant to Fed. R. Civ. P. 6(d). *See Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 148 n.1 (1984) (applying presumption that notice is received three days after issuance, and citing former Fed. R. Civ. P. 6(e)); *see also Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 526 (2d Cir. 1996) ("[N]ormally it may be assumed, in the absence of challenge, that a notice provided by a government agency has been mailed on the date shown on the notice.") (citing *Baldwin*). Moreover, the Fourth Circuit does not adhere to an "actual notice"

_____

[5] Although exhaustion of the administrative process is a jurisdictional prerequisite to suit, a plaintiff need not actually receive a right-to-sue letter from the EEOC in order to establish exhaustion and, hence, jurisdiction. Rather, "[e]ntitlement to the letter, without actual receipt of it, is sufficient to support federal jurisdiction." *Moore v. City of Charlotte*, 754 F.2d 1100, 1104 n.1 (4th Cir. 1985); *see Perdue v. Roy Stone Transfer Corp.*, 690 F.2d 1091, 1093 (4th Cir. 1982) (holding that "it is entitlement to a 'right to sue' notice, rather than its actual issuance or receipt, which is a prerequisite to the jurisdiction of the federal courts" under Title VII).

The EEOC is statutorily required to provide a right-to-sue notice to a complainant within, at the latest, 240 days after a claim of discrimination is filed, if the EEOC does not earlier dismiss the claim for lack of probable cause, achieve a conciliation agreement with the employer, or initiate litigation. *See* 42 U.S.C. § 2000e-5(f)(1); *see also id.* § 2000e-5(b), (d). If the required time period elapses, the jurisdictional prerequisites are satisfied, regardless of whether the EEOC actually issues a right-to-sue letter.

rule. Rather, a plaintiff is deemed to have received notice when the right-to-sue letter is received by a member of the plaintiff's household of suitable age and discretion, *see Harvey v. City of New Bern Police Dept.*, 813 F.2d 652 (4th Cir. 1987), or "when the Postal Service delivers notice to a plaintiff that the right-to-sue letter is available for pickup," even if the plaintiff does not actually take possession of the letter until a later date. *Watts-Means v. Prince George's Family Crisis Ctr.*, 7 F.3d 40, 42 (4th Cir. 1993).

In this case, plaintiff's Right to Sue Letter is dated October 18, 2011. He filed suit 132 days later, on February 27, 2012. Accordingly, defendants assert that suit was not timely filed. In response, plaintiff asserts in his affidavit that he "received a copy of the EEOC Right to Sue Letter by email from the EEOC on November 29, 2011," exactly ninety days before suit was filed, and "forwarded it" to his attorney "on January 19, 2012." Weathersbee Aff. ¶¶ 1-2. Appended as an exhibit to plaintiff's affidavit is what plaintiff avers is a "true and accurate copy of the email and attachment [he] received from EEOC and forwarded to [his attorney]." *Id.* ¶ 3; *see* ECF 28-1 at 7 (email from plaintiff to his attorney). The email to plaintiff from an EEOC employee was sent on November 29, 2011, with a PDF attachment, and has the subject line, "copy of NRTS" (*i.e.*, Notice of Right to Sue).

Defendants argue, and I agree, that plaintiff fails to rebut the presumption that he received the Right to Sue Letter on October 21, 2011, three days after it was issued. Notably, the email of November 29, 2011, from the EEOC employee to plaintiff clearly states that it contained a "copy" of the Right to Sue Letter, and plaintiff does not assert in his affidavit that he did not receive the Right to Sue Letter until he received the EEOC employee's email. Rather, he

avers that he "received a *copy* of the EEOC Right to Sue Letter" via email. Weathersbee Aff. ¶ 1 (emphasis added).

To be sure, the presumptions that a Right to Sue Letter is mailed on its date of issuance and is received three days after mailing "are convenient and reasonable in the absence of evidence to the contrary," but they are not "irrebuttable." *Sherlock*, 84 F.3d at 526. "If a claimant presents sworn testimony or other admissible evidence from which it could reasonably be inferred either that the notice was mailed later than its typewritten date or that it took longer than three days to reach her by mail, the initial presumption is not dispositive." *Id. See, e.g.*, *Hilton v. Bedford Paving, LLC*, 769 F. Supp. 2d 92, 99 (W.D.N.Y. 2010) (holding presumption of receipt three days after issuance rebutted where plaintiffs "submitted sworn affidavits indicating that they never received the right-to-sue letter" and defendants did not "submit[ ] any contrary evidence, and . . . rel[ied] solely on the . . . presumption that Plaintiff received the letter three days after it was dated"); *Edwards v. Galveston-Texas City Pilots*, 203 F. Supp. 2d 759, 775 n.9 (S.D. Tex. 2002) (holding presumption of receipt three days after issuance not rebutted where plaintiff "testifie[d] that he [did] not remember when he received the letter"); *Griffin v. Acacia Life Ins. Co.*, 151 F. Supp. 2d 78, 80-81 (D.D.C. 2001) (holding presumption of receipt three days after issuance not rebutted where plaintiff did not remember date of receipt but offered sworn declaration of her attorney that attorney's calendar contained notation of due date for filing complaint; stating that attorney's records supported inference of date that attorney believed notice had been received, but could not "establish[ ] when plaintiff *actually received* the letter") (emphasis in original).

What is glaringly absent from plaintiff's affidavit is any assertion that he never received the original Right to Sue Letter. In fact, plaintiff affirmatively states that he received a "copy" of the Right to Sue Letter via the email from the EEOC employee, not that this was the first occasion on which he received the letter. Plaintiff's averments are insufficient to rebut the presumption of receipt of the Right to Sue Letter three days after its issuance. Accordingly, plaintiff's Title VII claims are time-barred and will be dismissed.[6]

Even if plaintiff's Title VII claims were not time-barred, they would fail on the merits for the same reasons that his § 1981 and § 1983 claims fail, as discussed below.

D. Section 1981 and Section 1983 (Equal Protection)

Like Title VII, 42 U.S.C. § 1981 prohibits, *inter alia*, "discrimination in employment on the basis of race." *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551-52 (4th Cir 2006). *See Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975) ("§ 1981 affords a federal remedy against discrimination in private employment on the basis of race"). In relevant part, 42 U.S.C. § 1981(a) provides: "All persons within the Jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Section 1981(b) states: "For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[7]

---

[6] For this reason, I need not reach defendants' argument that some of plaintiff's Title VII claims were not exhausted in the EEOC proceeding.

[7] Section 1981(b) was enacted as part of the Civil Rights Act of 1991 in order to overrule legislatively the Supreme Court's holding in *Patterson v. McLean Credit Un*ion, 491 U.S. 164 (1989), to the effect that § 1981 applied "only to the formation of a contract" and not "to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions." *Id.* at 176-77. *See generally*

Unlike plaintiff's Title VII claim, his § 1981 claim is not time-barred. Because plaintiff's § 1981 claim does not concern discrimination in the formation of his employment contract, but rather alleged post-formation discrimination, the applicable statute of limitations is four years, pursuant to 28 U.S.C. § 1658. *See Jones v. Circuit City Stores, Inc.*, 370 F.3d 417, 420-21 (4th Cir. 2004) (applying four-year statute of limitations under § 1658 to claims of post-contract-formation employment discrimination under § 1981).

Section 1983 establishes a cause of action against any "person" who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. It "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Here, plaintiff invokes § 1983 as a vehicle for the contention that defendants discriminated against him on the basis of race, thereby violating the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. A public employee may bring a claim of employment discrimination under § 1983 and the Equal Protection Clause. *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 119-20 (1992); *Campbell v. Galloway*, 483 F.3d 258, 272 n.5 (4th Cir. 2007); *Booth v. Maryland*, 327 F.3d 377, 382 (4th Cir. 2003).

As with other § 1983 claims, there "is no respondeat superior liability under § 1983" in employment discrimination cases. *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir.), *cert. denied*, 543 U.S. 813 (2004). Local governments "are not vicariously liable under § 1983 for

*CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 449-51 (2008) (discussing post-*Patterson* enactment of § 1981(b)).

their employees' actions." *Connick v. Thompson*, ___ U.S. ___, 131 S. Ct. 1350, 1359 (2011). Thus, liability under § 1983 accrues to an individual municipal officer, such as Chief Clack, only if the decision to demote plaintiff is attributable to him (which it is, in this case), and would accrue to the City only if the governing body of the municipality "retain[ed] final review authority" over the "personnel decision," but would not accrue if the decision were "committed to [the supervisor's] discretion." *Love-Lane*, 355 F.3d at 782 (citing *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978)). Here, there is no evidence concerning the degree, if any, to which the City retained review authority over Chief Clack's personnel decisions, and the parties have not briefed this issue.

In contrast to plaintiff's Title VII claim, his § 1983 claim is not time-barred. The limitations period that is applied in § 1983 claims is the general or "residual" statute of limitations governing unenumerated intentional torts in the state where the cause of action arose. *See Wallace v. Kato*, 549 U.S. 384, 389 (2007); *Owens v. Okure*, 488 U.S. 235, 236 (1989) (citing and expanding upon rule announced in *Wilson v. Garcia*, 471 U.S. 261 (1985)). Thus, in Maryland, the statute of limitations under § 1983 is three years. *See* Md. Code (2013 Repl. Vol.), § 5-101 of the Courts & Judicial Proceedings Article (general three-year statute of limitations under Maryland state law); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 187 (4th Cir.1999) (stating that claims under § 1983 "borrow the state's general personal injury limitations period, which in Maryland is three years").

The framework of proof for claims of intentional employment discrimination brought under § 1981 and § 1983 is the same as the framework applicable to a Title VII claim. *See Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004) (stating, in case involving employment

discrimation claim under Title VII, § 1981, and § 1983, that "the elements required to establish such a case are the same under all three statutes") (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n.1 (1993)). In particular, discrimination may be proven by one of two methods: (1) "'direct or indirect'" evidence of discrimination, under "'ordinary principles of proof,'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted); or (2) the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Lightner v. City of Wilmington*, 545 F.3d 260, 263 n.* (4th Cir. 2008) ("[T]he *McDonnell Douglas* framework applies to discrimination claims under . . . § 1981."); *Love-Lane*, 355 F.3d at 786 (stating that "the *McDonnell Douglas* framework, developed for Title VII, has been used to evaluate race discrimination claims under the three statutes," *i.e.*, Title VII, § 1981, and § 1983); *Gairola v. Com. of Va. Dept. of Gen'l Servs.*, 753 F.2d 1281, 1285-86 (4th Cir. 1985). Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

These two methods of proof establish the standards to prove intentional employment discrimination at trial, *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir.2004) (en banc), but they inform a court's evaluation of the parties' proffers of evidence at the summary judgment stage. "To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'" *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (internal citations and quotation marks omitted; alteration in original). In *Warch v. Ohio Casualty Insurance Co.*, 435

F.3d 510, 520 (4th Cir. 2006), the Fourth Circuit explained the showing that is required to withstand summary judgment via ordinary principles of proof:

> Direct evidence must be "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc) (citation and internal quotation marks omitted). Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action. *See Brinkley* [*v. Harbour Rec. Club*], 180 F.3d [598,] 608 [(4th Cir. 1999)] ("To survive summary judgment on the basis of direct and indirect evidence, Brinkley must produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude and the employment action.") [*overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)].

Plaintiff has not alleged or adduced any direct or indirect evidence of discrimination on the basis of ordinary principles of proof. Indeed, in his deposition, he candidly admitted that he could not point to any evidence of an explicit racial motivation for his demotion. *See* Weathersbee Dep. at 59-60.[8] Accordingly, the focus shifts to the second method of proof: the *McDonnell Douglas* approach.

The *McDonnell Douglas* approach establishes three stages at which the burden of evidentiary production is shifted back and forth between the plaintiff and defendant. However, under the *McDonnell Douglas* approach, the "ultimate burden of persuasion . . . never 'shifts' from the plaintiff" to prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted).

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion*

---

[8] At his deposition, when asked whether he had witnessed the use of any "racial slur" or other "conduct that is racist" at his workplace, plaintiff responded in the negative and remarked: "That's not the new racism. You're not going to see that. The new racism isn't outward. The new racism is making calls behind your back." Weathersbee Dep. at 59.

*Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff in an employment discrimination suit is generally required to show that the employer took adverse action against the plaintiff "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

For instance, in *McDonnell Douglas*, the prima facie case of racial discrimination in hiring was formulated as follows, 411 U.S. at 802:

> (i) that [the plaintiff] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

The rationale of the *McDonnell Douglas* approach is that, if a plaintiff proves a prima facie case, and the defendant submits no evidence of any legitimate basis for its actions, the court or fact finder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). Under the *McDonnell Douglas* approach, if a plaintiff establishes at trial, by a preponderance of the evidence, a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).

"If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant" and "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993). When the defendant meets its burden of production, the plaintiff must then prove, by a preponderance of the evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256. *See also Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [Plaintiff] had to prove 'both that the reason was false, and that discrimination was the real reason.'") (*quoting Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

On the other hand, if the defendant fails to meet the burden of producing "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action," and the plaintiff has proved a prima facie case, "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3. *See Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

In a case such as this one, involving alleged racially discriminatory discipline, the Fourth Circuit has formulated the prima facie case as follows: "[The] plaintiff must show '(1) that plaintiff engaged in prohibited conduct similar to that of a person of another race . . . and (2) that

disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person.'" *Lightner*, *supra*, 545 F.3d at 264-65 (quoting *Moore*, *supra*, 754 F.2d at 1005-06).

Plaintiff has failed to produce evidence that could establish a prima facie case. In his affidavit, plaintiff asserts that "[t]wo white officers," whom plaintiff identifies by name, were "temporarily demoted," rather than permanently demoted, for misconduct that plaintiff contends was similar to his. Weathersbee Aff. ¶ 8. One officer was a lieutenant who plaintiff asserts had a "comparable" disciplinary record to plaintiff's and was demoted to pump operator for "missing a call for service because his truck and crew . . . was far outside of his district . . . on a non-Fire Department matter." *Id.* ¶ 9. Similarly, plaintiff claims that a captain with a comparable disciplinary record was temporarily demoted to lieutenant for six months because he "neglected his duties with respect to the supervision of his fire station and its employees." *Id.*

However, plaintiff advances no evidence concerning these two alleged comparators other than his own assertions, quoted above. Plaintiff's affidavit does not indicate that he has firsthand knowledge of the circumstances of either comparator's alleged temporary demotion, so as to be able to testify competently on a non-hearsay basis as to the infractions committed by either officer or the discipline imposed on them. Moreover, although discovery in this case has now concluded, plaintiff presents no documentary evidence from BCFD records to corroborate his characterization of the discipline imposed on his comparators, the nature of their infractions, or their prior disciplinary history. Plaintiff's bare assertions, without foundation, are insufficient to generate a dispute of material fact. An "affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would

be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). With respect to his allegations about his comparators, plaintiff's affidavit fails that test and therefore cannot withstand defendants' summary judgment motion.

Indeed, it is noteworthy that plaintiff alleges that he was actually offered a temporary demotion of approximately six months' duration, albeit with the condition that he waive any claim to back pay for the six-month period. He was unwilling to accept that condition. For all that the record shows, plaintiff's alleged comparators could have been presented with the exact same offer as plaintiff but, unlike Weathersbee, chose to forgo back pay rather than, in Mr. Fugate's words, "roll the dice" by contesting their demotion. *See* Fugate Emails. Simply put, plaintiff has failed to present evidence to show that either of his supposed comparators actually "'engaged in prohibited conduct similar to'" plaintiff or that "'disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person.'" *Lightner*, *supra*, 545 F.3d at 264-65 (citation omitted).

In addition, plaintiff claimed in his complaint that he was demoted so that a white paramedic, whom he identified by name, could be promoted into his vacated position of lieutenant. However, Chief Clack averred in his declaration that "[p]romotions to the rank of Lieutenant are a regular occurrence in the BCFD," Clack Decl. ¶ 27, and that the "BCFD has no discretion in promoting particular individuals to lieutenant" because, "[b]ased on the collective bargaining agreements between the BCFD and the firefighters' unions," all "Lieutenant promotions are made automatically from a ranked list based solely on a candidate's score on a written exam." *Id.* ¶¶ 25-26. According to Chief Clack, "Mr. Weathersbee was not demoted in

order to promote" the white paramedic identified by plaintiff, *id.* ¶ 31, and the paramedic "did not fill Mr. Weathersbee's position." *Id.* ¶ 32. Moreover, she could not have done so, because "EMS Lieutenants and Fire Lieutenants operate within different divisions of the BCFD and perform different functions," *id.* ¶ 30, and so the paramedic "could not have been promoted into Plaintiff's position at Engine 31 or any Fire Lieutenant's position at any other company in the fire suppression division of the BCFD." *Id.* ¶ 33.

Plaintiff provides no response to these averments in either his Opposition or his affidavit. Indeed, he does not mention the paramedic in either document. Accordingly, he has raised no genuine dispute of material fact regarding her.

Regardless of the inadequacy of plaintiff's prima facie case with respect to comparator evidence, even if I were to assume, for the sake of argument, that plaintiff had established a prima facie case, his claims still could not survive summary judgment. At the second stage of the *McDonnell Douglas* analysis, plaintiff has provided no basis to suggest that his well-documented performance derelictions, including failing on several occasions to respond to the scene of an emergency in progress, were not legitimate, nondiscriminatory bases for discipline. They plainly were.[9]

In any event, once the defendant employer has proffered evidence of a legitimate, nondiscriminatory basis for its adverse employment action, the *McDonnell Douglas* analysis

---

[9] Of course, in the absence of comparator evidence, the Court cannot discern whether demotion, although imposed on plaintiff for well-documented infractions, was a disproportionate response to those infractions as compared to discipline meted out to other officers who committed similar offenses. However, the burden is on plaintiff to present adequate comparator evidence, and he has failed to do so. Moreover, plaintiff's history of similar infractions, resulting in progressively escalating punishment on each occasion, with multiple layers of departmental review, is suggestive of a measured and proportional disciplinary system.

enters its third stage, at which the burden of production shifts back to the plaintiff to put forth evidence that, if believed, could convince a finder of fact that the employer's purported reasons were pretextual, and that the actual basis for its employment decision was the plaintiff's race. Put another way, the question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, *supra*, 477 U.S. at 252. "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

Plaintiff has submitted no evidence whatsoever to suggest that the stated basis for his demotion was a pretext for racial discrimination. He claimed in his EEOC Charge that Chief Clack told plaintiff "that he wanted to temporarily demote [Weathersbee], but he found that he could not do so." EEOC Charge at 2. Defendants challenge the admissibility of this statement on hearsay grounds. *See* Motion at 17 n.12. Defendants are incorrect as to admissibility, *see* Fed. R. Evid. 801(d)(2) (providing that admissions of a party-opponent are "not hearsay"), but it does not matter because Chief Clack's alleged statement simply is not suggestive of a pretext for racial discrimination or the falsity of the stated reason for plaintiff's demotion.

As to the emails from Mr. Fugate regarding plaintiff's post-demotion Civil Service Commission appeal and union grievance, defendants again argue that the emails are inadmissible hearsay if offered to prove the truth of the alleged offer of temporary demotion in exchange for waiver of a claim for back pay. *See* Reply at 6. I need not resolve defendants' evidentiary argument because, even if Fugate's emails are not hearsay, they do not advance plaintiff's claim of racial discrimination. Nothing in Fugate's emails permits an inference that the BCFD's stated

reasons for plaintiff's demotion were false or pretextual, that similarly situated firefighters of other races who were demoted were offered temporary demotions on more favorable terms, or that plaintiff's race formed any part of the decision to demote him.

For the foregoing reasons, defendants are entitled to summary judgment with respect to plaintiff's claim under § 1981 and his equal protection claim under § 1983.[10]

### E.  Section 1983 (Due Process)

In his complaint, plaintiff also asserts a violation of the Due Process Clause of the Fourteenth Amendment, alleging that defendants "fil[ed] false charges against him."  Complaint ¶ 42.

The Due Process Clause "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  Courts have long recognized that "the fundamental requisite of due process of law is [notice and] the opportunity to be heard."  *Grannis v. Ordean*, 234 U.S. 385, 394 (1914); *see LaChance v. Erickson*, 522 U.S. 262, 266 (1998) ("[T]he core of due process is the right to notice and a meaningful opportunity to be heard."); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (observing that due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").  Yet "'due process, unlike some legal rules, is not a

_____

[10] In his complaint, plaintiff used the terms "hostile work environment" and "retaliation." However, his complaint did not allege facts that would substantiate either theory of liability, and plaintiff did not respond in his Opposition to defendants' arguments against such claims.  Thus, I need not discuss those claims further, except to say that judgment will be entered in defendants' favor with respect to plaintiff's § 1981 and § 1983 equal protection claims in their entirety, regardless of the theory on which liability is asserted.

technical conception with a fixed content unrelated to time, place and circumstances.'" *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 895 (1961)). Rather, it "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *see Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 484 (1988).

It is axiomatic that, in order to state a claim for a due process violation, a plaintiff's allegations must implicate a protected liberty or property interest. *Guerra v. Scruggs*, 942 F.2d 270, 277 (4th Cir. 1991); *see, e.g.*, *Mallette v. Arlington County Empls. Supp. Ret. Sys. II*, 91 F.3d 630, 634 (4th Cir.1996) ("[Plaintiff] is entitled to procedural due process only if she holds a constitutionally protected property interest . . . ."); *see also Morrissey*, 408 U.S. at 481 ("Once it is determined that due process applies, the question remains what process is due.").

Under some circumstances, a § 1983 claim will lie for due process deprivation in public employment. "'The root requirement' of the Due Process Clause" is "'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)) (emphasis in original). In *Loudermill*, the Supreme Court held that "[t]his principle requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Loudermill*, 470 U.S. at 542 (citation omitted); *see Bd. of Regents v. Roth*, 408 U.S. 564, 576-77 (1972).

Whether a plaintiff has a property interest in his employment turns on whether the employer is required to establish cause, under state law, to terminate the employee. *See generally Loudermill*, 470 U.S. at 54; *Bishop v. Wood*, 426 U.S. 341, 344-45 (1976). Moreover,

deprivation of an employee's property interest may be "less severe than the deprivation caused by a discharge," yet still be subject to due process protection. *Garraghty v. Jordan*, 830 F.2d 1295, 1299 (4th Cir. 1987). "So long as a deprivation is not *de minimis*, 'its gravity is irrelevant to the question whether account must be taken of the Due Process Clause.'" *Id.* (quoting *Goss v. Lopez*, 419 U.S. 565, 576 (1975)).

In *Garraghty*, the Fourth Circuit held that a five-day suspension of a state prison warden who was entitled to "be terminated or suspended only for cause" constituted a non-*de minimis* deprivation where the warden "lost compensation and other emoluments of the office for the period of the suspension." *Garraghty*, 830 F.2d at 1299. It follows that plaintiff's indefinite demotion to firefighter, which carried with it a $20,000 per year pay cut, was not *de minimis*. Moreover, although plaintiff does not specifically allege it, the Court will assume, *arguendo*, that plaintiff was entitled under City personnel ordinances not to be demoted without just cause.

Nevertheless, plaintiff's claim of a due process violation fails because he does not point to any specific procedural irregularity or other deficiency in the process by which he was demoted. Indeed, he conceded at his deposition that more than one hearing was held with respect to his demotion and that he had representation at the hearings. *See* Weathersbee Dep. at 25. Moreover, although he claimed in his complaint that defendants disciplined him on the basis of "false charges," there is no dispute that Engine 31 failed to respond to the scene to which it was dispatched during the incident in March 2009, nor is there any dispute regarding the facts underlying plaintiff's prior disciplinary infractions. The record presented by defendants includes written statements from plaintiff, among other BCFD personnel involved in each incident, generated in the course of the internal investigation of each incident. *See generally* Ex.A, B, C

to Motion (ECF 20-3, 20-4, 20-5). Plaintiff's statements in connection with each incident did not dispute the underlying facts at issue. Rather, plaintiff offered excuses for his derelictions. In connection with the March 2009 incident that precipitated his demotion, plaintiff claimed that he did not receive the call from dispatch because it somehow did not come through to his radio. But, his employer was not required to accept his version of events.

In the context of a § 1983 due process claim, a defendant government body that deprives the plaintiff of a property interest "can, of course, disbelieve the [plaintiff's] explanation [of an alleged infraction]. If that occurs, due process would be satisfied as long as the procedures afforded the [plaintiff] were constitutionally adequate and the conclusion was rational." *Seal v. Morgan*, 229 F.3d 567, 579 (6th Cir. 2000). Chief Clack and the BCFD obviously either did not believe plaintiff's excuses, or did not accept that they absolved his misconduct. Plaintiff has not identified any respect in which the procedures underlying his demotion were constitutionally inadequate. Accordingly, defendants are entitled to summary judgment as to plaintiff's § 1983 due process claim.

### Conclusion

For the foregoing reasons, all of plaintiff's claims against the BCFD and his Title VII claims against Chief Clack will be dismissed, with prejudice. Moreover, plaintiff's Title VII claims against the City (Counts One and Two) will be dismissed as time-barred. Judgment will be entered in favor of the City and Chief Clack with respect to plaintiff's claims under § 1981 and § 1983 (Counts Three and Four, respectively). An appropriate Order follows.

Date: September 10, 2013 _____/s/_____
Ellen Lipton Hollander
United States District Judge